Dee HOLLANDER and Don Hollander, Plaintiffs,

v.

SANDOZ PHARMACEUTICALS CORP., a New Jersey corporation, Defendant.

No. Civ. 96–756–T.

United States District Court, W.D. Oklahoma.

March 21, 2000.

James E. Frasier, James T. Price, Frasier & Frasier, Tulsa, OK, Glenn J. Shrader, Jr., Walker & Walker, Oklahoma City, OK, for plaintiffs.

Richard M. Eldridge, Thomas E. Steichen, Rhodes Hieronymus Jones Tucker & Gable, Tulsa, OK, Joe Hollingsworth, Katharine R. Latimer, Kirby T. Griffis, Spriggs & Hollingsworth, Washington, DC, for defendant.

## ORDER

RALPH G. THOMPSON, District Judge.

Plaintiffs Dee Hollander and Don Hollander instituted this manufacturers products liability action against Novartis Pharmaceuticals Corporation ("NPC"), formerly know as Sandoz Pharmaceuticals Corporation, alleging that Dee Hollander suffered a stroke caused by the ingestion of Parlodel, a prescription drug formulated and sold by the defendant to prevent postpartum physiological lactation.[1] Bromocriptine mesylate ("bromocriptine") is Parlodel's active ingredient.[2]

NPC has filed a motion for summary judgment on the ground the plaintiffs fail to present sufficiently reliable evidence to prove that Mrs. Hollanders stroke could be, and in fact was, caused by Parlodel.[3] The plaintiffs' evidence of causation fails the test for scientific reliability set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the defendant contends, because their experts admit their causal hypotheses have not been tested and validated using the scientific method and they do not rule out other causes of Mrs. Hollander's stroke.

"In *Daubert*, the Supreme Court held district judges must act as gatekeepers in admitting expert testimony, thereby ensuring that such evidence is both relevant and reliable." *Kinser v. Gehl Co.*, 184 F.3d 1259, 1270 (10th Cir.1999) *cert. denied*, —— U.S. ——, 120 S.Ct. 985, 145 L.Ed.2d 934 (2000).[4] Prior to *Daubert*, the "general acceptance" test formulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), was the dominant standard for determining the admissibility of novel scientific evidence at trial. In *Daubert* the Supreme Court held that the *Frye* test was superseded by the adoption of the Federal Rules of Evidence.[5]

---

1. *On July 23, 1990 after the delivery of her second child, Mrs. Hollander, who had elected not to breastfeed, was prescribed Parlodel by her treating obstetrician, Dr. Quinn. Mrs. Hollander woke up on July 29, 1990, unable to speak or to move her right side. A CT-scan of her brain revealed an intracerebral hemorrhage.*

2. *In 1990 an approved indication for Parlodel was the prevention of physiologic lactation. The previous year the FDA had requested that the indication be withdrawn. The defendant subsequently agreed and, in 1994, it was withdrawn.*

3. *Although the plaintiffs contest some of the facts asserted by the defendant in its Statement of Material Facts, no material factual disputes exist which preclude the entry of summary judgment*

4. *Kinser was abrogated on other grounds by Weisgram v. Marley Co.,* —— U.S. ——, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

5. *Fed.R.Evid. 702, which governs expert testimony, provides:*

   *If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.*

[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable ... The subject of an expert's testimony must be 'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.

*Daubert,* 509 U.S. at 589–90, 113 S.Ct. 2786.

▇▇▇ "Under *Daubert,* when faced with a proffer of expert scientific testimony, a district court 'must determine at the outset, pursuant to [Fed.R.Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.'" *Summers v. Missouri Pacific R.R. System,* 132 F.3d 599, 603 (10th Cir.1997) (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786). This standard ensures that the proffered evidence is not only relevant, but reliable. Scientific knowledge tests reliability, which is "verified by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Summers,* 132 F.3d at 603 (quoting *Daubert* 509 U.S. at 592–93, 113 S.Ct. 2786). "Several non-dispositive factors should be considered when measuring the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. In considering these factors,

'[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.'" *Id.* at n. 4 (quoting *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786) (internal citations omitted).

▇▇▇ Relevancy is evaluated by the second element, helpfulness to the trier of fact. "Relevance is determined by ascertaining 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" *Summers,* 132 F.3d at 603 (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786). "With respect to assessing relevance, 'the district court must determine whether the methodology or reasoning underlying the expert opinion relates to the issue at hand, i.e., whether it assists the trier of fact in understanding the evidence or a fact in issue. In this regard, the *Daubert* Court discusses the concept of "fitness," that is, whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Id.* at n. 5 (quoting *Joiner v. General Elec. Co.,* 78 F.3d 524, 530 (11th Cir.1996) (internal quotation and citations omitted)). "The inquiry envisioned by Rule 702 is ... a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786.

▇▇▇ A Daubert hearing was held to evaluate the reliability and relevance of the plaintiffs' experts' proposed testimony. Having considered the testimony and evidence introduced at the hearing, combined with that submitted by both parties in conjunction with the defendant's motion,[6]

---

**6.** *The defendant's Statement of Material Facts nos. 118–132 consist of identifications of the defendant's exhibits, denominated Attachments. In their responsive Statement of Material Facts in Dispute, the plaintiffs declare that many of the defendant's exhibits are incomplete and identify their exhibits which contains the omitted portions. However, the court has been handicapped by the plaintiffs' failure to designate pages or portions of those exhibits,*

*many of which are multi-page. Repeatedly the plaintiffs refer generally to voluminous exhibits without specific page citations. For example, in their Statement of Material Facts in Dispute, no. 42, the plaintiffs cite "additional Kulig materials, Ex. 43; Defendant SPC's Attachments 1–5." Those exhibits/ attachments are comprised of hundreds, if not thousands, of pages of materials, which the court, if not directed to specific pages, has not reviewed.*

the court concludes that the opinions of plaintiffs' expert witnesses do not meet the reliability requirements of Rule 702 as interpreted by the Supreme Court in *Daubert*.[7] Because the plaintiffs' expert testimony is inadmissible [8] and the requisite causation cannot be established without it, the defendant's motion for summary judgment is granted. The bases for the court's decision follow.

See generally Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.") (emphasis added) (internal quotation omitted). Another example of inadequacy in the plaintiffs' brief/factual statement is found in their Statement of Material Facts in Dispute no. 48, which asserts that: "[t]he Witlin article limits are explored in her deposition, undermining Defendant SPC's reliance thereon and showing that no one article proves anything," and cites as support the doctor's deposition, which consists of over two hundred pages, with no page designations.

The court notes, however, that with the exception of the nondesignated exhibits that are extensive in length, it has reviewed all of the exhibits referred to in the plaintiffs' response brief and their Statement of Material Facts in Dispute.

7. In its brief, the defendant focused on the testimony of Drs. Kulig, Iffy and Jose, although the plaintiffs appear to rely principally on Drs. Kulig and Iffy to establish causation. The court has limited its discussion to those experts. The plaintiffs state that "Dr. Jose's opinions are well and fully set forth in Defendant SPC's Attachment 3," and referred to the "Jose, Lexchin and Lawrence materials" in their Statement of Material Facts in Dispute, nos. 20 and 46, but their failure to direct the court to specific pages of those materials precluded their review. The plaintiffs did cite pp. 93–98 of Dr. Lexchin's deposition testimony, defendant's Exhibit 5A, during the Daubert hearing and his testimony has been considered, but also has been found to be inadmissible under Daubert. Dr Lexchin responded, when asked whether he had an opinion to a reasonable degree of medical certainty that Parlodel causes stroke: "Based on very weak evidence, it may cause stroke." Defendant's Exhibit 5A, p. 105.

In their response brief, the plaintiffs summarize the evidence supporting their position that Parlodel causes strokes as: determinations by the Food and Drug Administration ("FDA") that the safety of Parlodel has not been demonstrated; [9] a finding of causation by a Kentucky jury; incidents of challenge/de-challenge/re-challenge; [10] case reports; the effects of other ergots; animal stud-

8. As the proponent of their medical experts' testimony, the plaintiffs have the burden of establishing its admissibility. Haggerty v. Upjohn Co., 950 F.Supp. 1160, 1162 (S.D.Fla. 1996), aff'd, 158 F.3d 588 (11th Cir.1998).

9. The court concurs with the plaintiffs that the Food and Drug Administration's explanation for its proposed withdrawal and its withdrawal of approval of the indication recommending bromocriptine for use in the prevention of physiological lactation would appear to support their causation claim. Plaintiffs' Exhibits 3, 4. However, the plaintiffs' reliance on the position taken by the Food and Drug Administration with respect to Parlodel is misplaced. "The methodology employed by a government agency 'results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances. The agencies' threshold of proof is reasonably lower than that appropriate in tort law, which traditionally makes more particularized inquiries into cause and effect and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm.'" Mitchell v. Gencorp Inc., 165 F.3d 778, 783 n. 3 (10th Cir.1999) (quoting Allen v. Pennsylvania Engineering Corp., 102 F.3d 194, 198 (5th Cir.1996)). The different standard is reflected in the agency's emphasis on the minimal benefits of using bromocriptine to prevent physiological lactation, described as "a self-limiting condition that generally lasts no longer than a few days." Plaintiffs' Exhibit 3, Notices, 59 Fed.Reg. 43348 (1994). Also, as noted by the defendant, the plaintiffs' experts do not rely on the FDA's actions as scientific evidence supporting their causation opinions.

10. The plaintiffs submit evidence of three incidents of challenge-dechallenge-rechallenge, plaintiffs' Exhibits 33–35, and cite the deposition testimony of Drs. Engelman and Buchholtz, Exhibits 16.48, both of whom generally attest that a challenge-rechallenge might be helpful in determining whether a particular drug caused a particular adverse reaction, but do not discuss the specific reports pertaining to Parlodel. Not only are there too few rechal-

ies;[11] and epidemiology studies.[12] The defendants have challenged the plaintiffs' evidence of medical causation, contending that their experts, Drs. Kulig, Iffy and Jose, (1) cannot explain how Parlodel causes vasoconstriction, which then causes hypertension and strokes; (2) improperly rely on anecdotal case reports and temporal proximity,[13] which do not constitute scientifically reliable bases for their opinions; (3) improperly reason that because some ergot alkaloids, which are in the same class as bromocriptine, cause hypertension, then bromocriptine may also cause hypertension; and (4) improperly rely on animal studies that are too differ-

ent from the facts presented by this case to be reliable. Both parties cite decisions by other courts, which have either admitted or excluded expert testimony on the issue of whether Parlodel can cause strokes in postpartum women.

■ The court concurs with the defendant's analysis of the plaintiffs' proof. Dr. Kulig could only list "possible" mechanisms[14] for Parlodel causing hypertension, Defendant's Exhibit 1A, pp. 88–96. Dr. Jose could not cite any studies or tests that proved his hypothesis that bromocriptine might cause high blood pressure, defendant's Exhibit 3B pp. 251–252, and admitted that his opinion about the potential

lenge reports for them to be consequential, they present the problems inherent in the other case studies or adverse drug reaction reports relied upon by the plaintiffs' experts. In one of the reports, entitled Possible Bromocriptine-induced Myocardial Infarction, plaintiffs' Exhibit 33, the authors state that "[t]he mechanism whereby Bromocriptine could have precipitated coronary artery spasm is not clear," and the vasospasm "might well be due to an unusual pathologic reactivity of the arterial coronary wall present in our patient."

11. The plaintiffs state in their Statement of Material Facts in Dispute that their experts are not relying on the dog hind leg study to show that Parlodel causes stroke, but cite it to controvert Sandoz's position that the drug can only cause hypotension and to show that it can cause vasoconstriction.

12. The plaintiffs contend that "[t]he Sandoz-commissioned study by ERI estimates the relative risk of stroke from Parlodel at 8.44—that is, that stroke is more than eight times more likely with a woman on Parlodel than a woman not on Parlodel." Plaintiffs' brief, p. 15. The plaintiffs' representation is erroneous and misleading, as the authors concluded that the findings pertaining to stroke were not statistically significant: "[t]he data for stroke were not informative ... [T]he stroke study does not provide enough information by which to evaluate the relation between bromocriptine and stroke." Defendant's exhibit 14, p. 2. See also plaintiff's Exhibit 41, p. 64 ("[A]s we've discussed, obviously the ERI study has a point estimate of 8.4, but it is so incredibly unstable that it really constitutes no evidence that any scientist would reasonably rely on.")

13. The only reference to temporal proximity by the plaintiffs in their brief or their Statement of Material Facts in Dispute is found in disputed

fact no. 40. Citing Dr. Engelman's testimony, plaintiffs' Exhibit 16, p. 152, the plaintiffs state that "[t]he temporal relation between hypertension and Parlodel exists." However, immediately after he testified that there was no question but that there was a temporal relation between the hypertension and the Parlodel, the doctor stated "[y]eah, there's no question there's a temporal relationship—that just means the two occurred together—but whether one occurred due to the other is quite a different question and answer." Although not specifically cited by the plaintiffs, Dr. Jose, in his expert report, relied in part on temporal proximity, stating that, "[b]ased upon the pharmacology and the proximity of the administration of bromocriptine, I believe that this drug was the cause of Mrs. Hollander's hypertension." Defendant's Exhibit 3C. "A temporal relationship by itself, provides no evidence of causation." In re Breast Implant Litigation, 11 F.Supp.2d 1217, 1232 (D.Colo.1998). See Willert v. Ortho Pharmaceutical Corp., 995 F.Supp. 979, 981 (D.Minn.1998) (Doctor's opinion undergirded by its reliance on temporal proximity between the drug prescription and the onset of hemolytic anemia and Guillain–Barre Syndrome.)

14. "'In the absence of an understanding of the biological and pathological mechanisms by which disease develops, epidemiological evidence is the most valid type of scientific evidence of toxic causation.'" In re Breast Implant Litigation, 11 F.Supp.2d at 1224. (quoting Linda A. Bailey, et al., Reference Guide on Epidemiology, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 126 (1994) (citations omitted)). As is discussed subsequently, the plaintiffs' experts' opinions are not substantiated by any epidemiological studies. See infra text pp. 1236–37.

mechanism or potential effect was still only a hypothesis, as opposed to scientific knowledge. Id. p. 253.[15] Dr. Iffy also classified his opinion that Parlodel caused Mrs. Hollander's stroke as being a hypothesis, which "is not held by a medical degree of certainty." Defendant's exhibit 2A pp. 17–19. The doctor's responses, when asked what evidence he was relying on for his opinion, further undermined the reliability of his testimony. Id. at pp. 20–31. For example, he stated that some animal studies bolstered his opinion that Parlodel causes vasospasm, "[b]ecause I noted that there was some demonstration of such an effect." He admitted, however, that the study did not conclude that Parlodel causes vasospasm, but merely "presented some suggestive evidence." Id. p. 27.[16]

Contrary to the plaintiffs' assertion, their experts do not rely on epidemiological studies[17] to support their position that Parlodel causes strokes. Although several studies have been conducted regarding the relationship between Parlodel and stroke,[18] none has shown a statistically significant link between them. Dr. Kulig testified that in his opinion the ERI study is the only epidemiology study on Parlodel use in the postpartum period, and he concurred with Drs. Iffy and Jose that, standing alone, it does not establish that Parlodel causes stroke. Defendant's exhibits 1A, p. 108–109; 2A, pp. 146–47. See defendant's exhibit 3A, p. 53–54. The ERI Report was based on two simultaneous case-control studies conducted "to evaluate the hypothesis that bromocriptine taken as a lactation preventive after delivery increases the risk of postpartum seizures and strokes." Defendant's exhibit 14, Summary, p. 1. The authors found that "[t]he data for stroke was not informative," id. at p. 2 and "provide[d] little information that can used to assess the effect of bromocriptine on the risk of postpartum stroke." Id. at p. 31. Dr. Kulig stated that he thought the ERI study was a "red flag ... for stroke development," but he "wouldn't rely upon it to say that there's a positive epidemiology study that shows the drug causes stroke." Defendant's exhibit 1A, p. 108.

■■■ Anecdotal case reports[19] are also relied upon by the plaintiffs' experts as support for their opinions that Parlodel causes postpartum strokes. Defendant's

**15.** *In his second expert report, Dr. Jose described two possible mechanisms by which bromocriptine can increase blood pressure, but could not testify to a reasonable degree of medical or scientific certainty that they occurred with respect to Mrs. Hollander or any human beings, as the necessary scientific testing has not been done. Defendant's exhibit 3B, pp. 302–304.*

**16.** *The doctor did not know if any other scientists or physicians endorsed his hypothesis—that some women for genetic or environmental reasons respond differently than most women to Parlodel, whose primary effect is hypotension—and stated he did not know if he even endorsed it. Defendant's exhibit 2A pp. 37–42.*

**17.** *"Epidemiological studies assess general causation via statistical probability, comparing the incidence of a particular disease in people exposed to a particular substance as opposed to people not so exposed. Epidemiologists use a variety of information sources, including medical records, questionnaires, clinical observations and surveys. Epidemiological studies fulfill the Daubert criteria. A hypothesis—does a substance cause a particular disease—is tested through the comparative survey.*

*Epidemiological studies are reported in peer-reviewed journals and the methodology is widely accepted as scientifically valid." Pick v. American Medical Systems, Inc., 958 F.Supp. 1151, 1158 (E.D.La.1997) (internal citations omitted).*

**18.** *The studies include the ERI study, the HCIA study, the Herings and Stricker study, and the Watson study. Defendant's exhibits 14–17. The Watson study found an increased risk for postpartum hypertension for patients with pregnancy-induced hypertension who used bromocriptine. However, the Watson study was "not an epidemiology study, per se" defendant's exhibit 1A, p. 113, and was described by Dr. Iffy as a "very limited study," which did not "claim [a] high degree of reliability." Defendant's exhibit 2A p. 152.*

**19.** *"Case studies assess general causation by the accumulation of individual cases showing the same connective pattern between a particular cause and effect. Case studies employ valid scientific methodology. A certain hypothesis is 'tested,' by examining a series of individuals, their [exposure] or lack of exposure to certain substances and their comparative symptoms.*

exhibit 2A, p. 122–123.[20] Because of their limitations, case reports have been repeatedly rejected as a scientific basis for a conclusion regarding causation.

> Such case reports are not reliable scientific evidence of causation, because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group ... [T]hey do not isolate and exclude potentially alternative causes ... and do not investigate or explain the mechanism of causation.

*In re Breast Implant Litigation,* 11 F.Supp.2d 1217, 1228 (D.Colo.1998) (quoting *Casey v. Ohio Medical Products,* 877 F.Supp. 1380, 1385 (N.D.Cal.1995)). *See Willert v. Ortho Pharmaceutical Corp.,* 995 F.Supp., 979, 981 (D.Minn.1998) ("Two bases undergird Dr. Busch's opinion: First, it is based on case reports and anecdotal evidence mentioned in the medical literature.")

The problems with case reports and adverse drug experience reports were acknowledged by Dr. Iffy—because they are not controlled studies and do not eliminate confounding variables,[21] the reported effect or injury could be due to some other cause than Parlodel. Defendant's exhibit 2A pp. 123–124. The court finds the case reports relied upon by the plaintiffs' experts are insufficient to establish the requisite causation, as they fail to take into account the postpartum incidence of stroke [22] and other factors. *See In re Breast Implant Litigation,* 11 F.Supp.2d at 1227–28 ("To the

---

The hypothesis [ ] can be retested by conducting the same review of other individuals. The fact that such studies frequently appear in medical journals also satisfies Daubert and establishes that cases studies are well-accepted in the scientific community as valid methodology. On the other hand, case studies suffer from methodological flaws. Case study populations are frequently small, leaving open the real possibility that the findings are due to chance rather than to exposure to the suspected substance. Another criticism is that the symptoms are often subjective on the part of the patient, susceptible to exaggeration or outright falsity (particularly if litigation is contemplated) ... Finally, courts have frequently rejected case studies as an insufficient basis to decide causation when they lack control groups." *Pick,* 958 F.Supp. at 1160–61.

Although the defendant criticizes the plaintiffs' experts reliance on case reports, the plaintiffs fail to address this issue in their response brief. They simply assert in their Statement of Material Facts in Dispute, no. 33, that by the mid–1980's Sandoz had received numerous reports of hypertension in connection with Parlodel and refer the court to their Exhibit 30, which contains "some examples." In their response brief, the plaintiffs state that many case reports exist, showing a pattern, yet they fail to provide other pertinent information about them. Dr. Kulig does discuss the number of adverse drug reaction reports in his affidavit, plaintiffs' Exhibit 19, yet the significance of those numbers is unknown, as there is no indication of how many women were prescribed Parlodel during the same time period. The FDA stated in its April, 1984 FDA Drug Bulletin, plaintiffs' Exhibit 39, that it had been estimated that in 1982 bromocriptine was used in approximately 500,000 women to suppress lactation. "Therefore, the significance of the 17 reports (of hypertension, seizures and cerebrovascular accidents) FDA has received is difficult to assess." *Id. at p. 4.*

**20.** Dr. Iffy testified that the evidence he relied upon other than case reports was not sufficient to support his causation opinion. Defendant's Exhibit 2A, pp. 122–23.

**21.** As noted by the defendants, case studies and adverse drug experience reports are less reliable because they do not take into account the increased risk of stroke during the six weeks after delivery. Steven J Kittner, M.D., Pregnancy and the Risk of Stroke, The New England Journal of Medicine, September 12, 1996, at 768. Defendant's exhibit 11. While the plaintiffs discount the Kittner study on the ground it does not exclude confounders such as bromocriptine or other ergot use, see Plaintiffs' Exhibit 5, pp. 134–140, the court finds that the postpartum incidence of stroke is a factor that should be considered. See Plaintiffs' Exhibit 48, p. 118–119; Defendant's Exhibits 54, 12, 13.

**22.** The court is not concluding that expert testimony, to be admissible under Daubert to prove causation, must be based on epidemiological data or multiple, identical case studies. However, "the reasoning or methodology underlying the testimony [must be] scientifically valid," Daubert, 509 U.S. at 592–93, 113 S.Ct. 2786, so that the evidence satisfies a minimal standard of reliability. That standard has not been met in this case.

extent that there are case or anecdotal reports noting various symptoms or signs in breast implanted women, without controls, these suggest only a potential, untested hypothesis that breast implants may be their cause ... An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."); *Haggerty v. Upjohn Co.*, 950 F.Supp. 1160, 1164 (S.D.Fla.1996) ("[T]he generally accepted view in the scientific community is that [the expert's] methodology [case reports, spontaneous reports of adverse medical events collected by the FDA, and animal studies] can be used to generate hypotheses about causation, but not causation conclusions ... [S]cientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies."), *aff'd*, 158 F.3d 588 (11th Cir.1998).

■ Causation also cannot be shown by the fact that other ergot alkaloids, which are in the same class as bromocriptine, cause hypertension. The plaintiffs have failed to demonstrate that bromocriptine and the other ergots have sufficiently similar physiological effects to warrant comparison.[23] They have failed to refute the defendant's evidence that "[t]he chemical diversity of ergot alkaloids corresponds to the *diversity of the biological activities of these compounds.*" B. Berde & E. Sturner, Ergot Alkaloids and Related Compounds, (1978), Defendant's exhibit 8, p. 2. Statements such as the following are inadequate to establish the reliability demanded by *Daubert*:

"[T]he other ergot alkaloids and what we know about them doesn't automatically mean that Parlodel does the same thing, but it's certainly suggestive that the drug could, and so let's look at the evidence to see whether or not the drug could act like the other ergot alkaloids, and it if does, it's not too much of a surprise ... But I'm not saying that one necessarily follows the other.... [I]n my opinion, the evidence is overwhelming that Parlodel acts just like the other ergot alkaloids."

Defendant's Exhibit 1A, Kulig depo., pp. 106–107. *See generally Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir.1999)

■ The court also rejects the plaintiffs' experts' attempt to extrapolate from animal studies to show that Parlodel causes strokes.[24] The studies relied upon involved different drugs, did not test the systemic effect of the drug, some of the animals were anesthesitized, and they were neither pregnant nor post-partum. *See* Defendant's Exhibit 3A pp. 104–105, 110, 113–14, 137; 1B, pp. 43, 80–88, 118. Doctors Jose and Kulig were unaware of any controlled animal studies in which bromocriptine caused an increase in blood pressure.[25] Defendant's Exhibit 3B p. 255; Exhibit 1B, p. 208. Although animal studies can contribute to an expert's scientific conclusions as to causation, the court finds that the animal studies on which the plaintiffs' experts rely are too dissimilar to the facts presented in this litigation to be reliable.

■ The court concludes that, due to the absence of supportive epidemiological evidence, the differences between bromocriptine and the other ergot alkaloids, the

---

**23.** *The plaintiffs did not dispute defendant's material fact nos. 46 and 47, which stated:*
  *46. Each ergot alkaloid has distinctive pharmacological properties.*
  *47. Bromocriptine differs physically from the other ergot alkaloids in several respects, the most notable of which is that a bromine atom has been added.*

**24.** *While the plaintiffs responded to the defendant's challenge to Dr. Kulig's reliance on the "dog hind leg. study," they did not specifically refute the limitations the defendants identified in the other studies he cited or the numerous*

studies relied upon by Dr. Jose. See defendant's material fact nos. 78–79, 81, 84, 87, 91–92. (The general statement—"Dr. Jose's opinions are well and fully set forth in Defendant SPC's Attachment 3," plaintiffs' Statement of Material Facts in Dispute, no. 20, p. 9, without specific page references, is ineffectual to controvert the defendant's proof.)

**25.** *Dr. Kulig did note, however, that "[t]he vast majority of the animal studies never attempted to measure blood pressure." Defendant's Exhibit 1B, pp. 207–208.*

dissimilarity of the animal studies, and the unreliability of the case reports,[26] the data and methods relied on by the plaintiffs' experts do not furnish a scientifically valid basis for their conclusion that Parlodel causes strokes.[27] Because the plaintiffs have failed to show that their experts' opinions are reliable and admissible under Fed.R.Evid. 702 and *Daubert*, they cannot establish causation, both general and specific. The defendant is, therefore, entitled to summary judgment.

Accordingly, the motion for summary judgment filed by the defendant is granted.

26. *Daubert simply requires more than an untested "hypothesis." Defendant's Exhibits 2A, pp. 39–45; 3A, p. 166.*

27. *Because the court finds the plaintiffs have failed to establish general causation, it is unnecessary to address in detail the defendant's argument that they also are unable to demonstrate specific causation. See In re Breast Implant Litigation,* 11 F.Supp.2d at 1223.

*However, the court concurs with the defendant that the plaintiffs' evidence on this issue also is inadequate to permit the issue of causation to be submitted to a jury, as the plaintiffs' experts fail to factor into their analyses, among other possible causes for Mrs. Hollander's stroke, the increased risk of stroke during the postpartum period.*